WR-71,296-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/15/2015 4:15:23 PM
Accepted 7/15/2015 4:38:34 PM
ABEL ACOSTA
CLERK

No. WR-__,____-15

Cause No. 114-1505-06 in the Trial Court

IN THE

## COURT OF CRIMINAL APPEALS OF TEXAS

EX PARTE CLIFTON WILLIAMS,
                                    Applicant,

## STATE'S RESPONSE TO MOTION FOR AN EMERGENCY STAY AND STATES MOTION TO DISMISS AS A SUBSEQUENT WRIT

D. MATT BINGHAM
Criminal District Attorney
Smith County, Texas

MICHAEL J. WEST
Assistant Criminal District Attorney

Bar I.D. No. 21203300
Smith County Courthouse
100 N. Broadway
Tyler, Texas 75702
ph: (903) 590-1720
fax: (903) 590-1719
mwest@smith-county.com

## I.    HISTORY OF THE CASE

Applicant, Clifton Williams was originally indicted in Cause No. 114-1385-06, filed on June 15, 2006, in the 114th District Court of Smith County, Texas, with the offense of Capital Murder. Applicant was subsequently re-indicted in Cause No. 114-1505-06, filed in the 114th District Court of Smith County, Texas, with the offense of Capital Murder on June 29, 2006, and the original indictment dismissed.

In October of 2006, a jury convicted Applicant of capital murder and pursuant to their answers to the special punishment issues the trial court sentenced Applicant to death. Applicant's motion for new trial was overruled. Applicant gave timely notice of appeal, and the parties filed their briefs with the Court of Criminal Appeals.

On November 28, 2008, this Court affirmed the defendant's conviction and sentence of death on direct appeal. *Williams v. State*, 270 S.W.3d 112 (Tex.Crim.App. 2008).

With direct appeal pending, Applicant filed an initial application for state habeas relief with the Court of Criminal Appeals which was subsequently denied by that Court. *Ex parte Williams*, No. 71,296-01 (Tex. Crim. App. March 18, 2009) (not designated for publication)

Applicant then turned to federal court on December 31, 2009, filing a petition for writ of habeas corpus in the Eastern District of Texas, Beaumont Division.

Petition for a Writ of Habeas Corpus, *Williams v. Thaler*, No. 1:09-cv-271 (E.D. Tex. Dec. 31, 2009). Said writ was subsequently denied. Order and Judgment, *Williams v. Thaler*, No. 1:09-cv-271 (E.D. Tex. March 26, 2013). On May 23, 2013 the same court denied Applicant's Motion for Certificate of Appealability. Order On Certificate of Appealability, *Williams v. Thaler*, No. 1:09-cv-271 (E.D. Tex. May 23, 2013).

Applicant then sought relief in the 5th Circuit Court of Appeals, which subsequently affirmed the District Court's denial of a Certificate of Appealability. *Williams v. Stevens*, 761 F.3d 561 (No. 13-70015) (Tex. 5th Cir. 2013).

The Supreme Court of the United States thereafter denied Applicant's petition for writ of certiorari from this proceeding on April 6, 2015. *Williams v. Stephens*, 2015 U.S. LEXIS 2351 (U.S., Apr. 6, 2015).

## II. Relevant Evidence at Applicant's trial

On direct appeal, this Court briefly summarized the trial testimony as follows:

> The evidence in this case shows that on July 9, 2005, the then 21-year-old appellant broke into the home of a 93-year-old woman and beat and stabbed her to death. The medical examiner testified that there was also evidence of strangulation. Appellant placed the victim's body on a bed and set the victim's body and the bed on fire. One of the police detectives involved in the case testified that this destroyed incriminating evidence. Appellant stole the victim's car and other property belonging to her. Appellant also threw away the clothes that he was wearing, disposed of the murder weapon, and lied to his family and to the police about his involvement in the offense. Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist "Monterral" Paxton, an acquaintance, forced him to

participate in the offense and that appellant's involvement in it was minimal. The police were unable to find any other evidence to substantiate this claim, and Monterral testified at appellant's trial that he was not involved in the offense. The overwhelming weight of the evidence supports the State's factual theory that appellant acted alone in murdering the victim

*Williams v. State*, 270 S.W.3d 112, 115 (Tex.Crim.App. 2008).

The record further shows that the State presented trial testimony from four witnesses regarding scientific testing that was conducted on the evidence:

1.     Mr. James Nichols, a DPS forensic scientist, testified that he and other employees at the lab worked to analyze the various items submitted by the investigators and compared them to samples of Applicant's DNA, as well as the DNA of other potential suspects. (RR 41: 68-86, 96-102, 106-21). Based upon scientific analysis, Mr. Nichols told the jury that Applicant's blood was found inside the victim's vehicle at various places. (RR 41: 126, 131, 134-35). His DNA profile was developed from a swab of a blood stain in that vehicle. (RR 41: 126-25). The probability that another person could have left the DNA profile identified as Applicant's was "approximately 1 in 2.573 sextillion for Caucasians; 1 in 43.22 sextillion for Blacks; and 1 in 5.531 sextillion for Hispanics." (RR 41: 127); *see also* (Attachment I - DPS Lab Supplemental Serology/DNA Report). A "sextillion" is equal to "a trillion times a billion." (RR 41: 129). Which is obviously a much greater number than the total population of the Earth, which was said to be 6.5 billion by this

expert. (RR 41: 126). The same unimaginable odds were applicable to Applicant's DNA found on a bloody tissue in the vehicle and on the driver's side floor mat. (RR 41: 132, 134-35); *see also* (Attachment I - DPS Lab Supplemental Serology/DNA Report).

Applicant's blood was found commingled with the victim's blood on the steering wheel of her stolen vehicle. (RR 41: 135, 141, 146, 159). A DNA profile from a blood mixture on the steering wheel of the same vehicle was attributed to Applicant with a probability that an "unrelated person at random, could be contributor to that stain" were "approximately 1 in 772.8 thousand for Caucasians; 1 in 10.62 millions for Blacks; and I in 3.68 million for Hispanics." (RR 41: 142); *see also* (Attachment I - DPS Lab Supplemental Serology/DNA Report). A Newport brand cigarette found in the victim's car was also traced to Applicant by the fact that his DNA was found on the filter of the cigarette. (RR 41: 129-30).

Mr. Nichols further found that possible suspects Dennis Campbell and Jarmarist "Monterral" Paxton were excluded as contributors of any of the DNA profiles found during the testing. (RR 41: 142); *see also* (Attachment I - DPS Lab Supplemental Serology/DNA Report).

2.  Mr. Michael Mayer was called to the stand next and told the jury that he is a forensic biologist working for the Tarrant County Medical Examiner's office and had

previously worked for a DPS lab. (RR 47: 78). He and another employee, Trisha Kacer, originally screened the biological evidence collected by the police and sent for analysis. (RR 47: 79-83). There was no spermatozoa or cellular constituents of semen found on the victim's vaginal or rectal smears. (RR 47: 86-87). However, a positive presumptive test for blood was made on the vaginal smear. (RR 47: 87). A presumptive test proved positive for the presence of blood on the victim's fingernail clippings. (RR 47: 92). The lab supervisor made the decision not to do DNA testing on that sample because of the large number of items needed to be tested. (RR 47: 93). The jury heard that such testing may have been done by Orchid Cellmark on the blood found on the victim's fingernails. (RR 47: 94).

3.     Ms. Cassie Johnson, a DNA analyst for Orchid Cellmark also testified. (RR 47: 146-47). Her testimony included that she analyzed the bloodstain evidence recovered by Detective Martin. (RR 47: 148-49). Her testing focused exclusively on the male components of DNA to the exclusion of the female components. (RR 47: 150). She was further provided with buccanal swabs from Applicant, Jamarist Paxton and Dennis Campbell for her analysis. (RR 47: 153). She tested the fingernail clippings of the victim and determined that the blood on them had a male origin. (RR 47: 154-55). Her testing revealed a composite DNA of more than one male, but excluded Applicant, Paxton and Campbell. (RR 47: 155). Courtney Daniel Warren was also

excluded as a contributor of the male DNA found on the clippings. (RR 47: 158-59, 64). However, Ms. Johnson could not say for sure whether the DNA mixture she found was from DNA in blood or from epithelial (skin) cells or the source or timing of the DNA she found. (RR 47: 187). Testing of other samples of carpet and nightgown showed positive presumptively for blood but DNA typing by sex was inconclusive. (RR 47: 162-64). The victim's vaginal swab which had tested presumptively for blood was likewise inconclusive for the presence of male DNA. (RR 47: 166).

4.    Ms. Casey Dupont, another forensic expert from Orchid Cellmark explained to the jury that she assisted in the testing of the material sent to her lab. (RR 47: 190-93). She tested blood items found in the victim's vehicle and matched Applicant's DNA to the samples. (RR 47: 195-99). One sample had a composite of mainly Applicant's DNA with a smaller amount of the victim's DNA. (RR 47: 198).

5.    Along with this scientific testimony, the jury also heard from Detective Clay Perrett, who testified that he was involved in the investigation into the killing of Mrs. Schneider. His initial investigation revealed that Mrs. Schneider's vehicle was missing from her house. (RR 39: 97, 104). He took part in the search of the area around the pond where a knife and personal property of the victim were recovered. (RR 39: 102-03).

This detective spoke with several persons who provided information regarding Applicant's actions the night of the murder and afterwards. (RR 39: 186). He told the jury that Applicant's fingerprints had been positively matched to a print found on the victim's vehicle, which led to a warrant for his arrest. (RR 39: 187-88).

A search of Applicant's apartment recovered a package of cigarettes of the same Newport brand as found in the victim's car. (RR 39: 191). Appellant would later be brought to the police department by his father and an uncle. (RR 39: 194).

Detective Perrett had an opportunity to speak with Applicant and fully Mirandized him and obtained a knowing waiver of his rights before taking his statement on videotape. (RR 39: 196, 201-07). Photos were taken of a cut on Applicant's hand. (RR 39: 200). Applicant's initial video statement to the police was published to the jury, over his objections and with certain redactions. (RR 39: 215-16; RR 64: State's Exhibit 203). The jury heard that Applicant lied during his video statement to the police, stating for example that he didn't know anyone who lived on Callahan street after the jury had already heard from another witness that Applicant had been seen visiting friends "countless times" on Callahan street. (RR 37: 106-07, 110-11, 138; RR 41: 10 ). Applicant knew and mentioned that the victim's vehicle had been wrecked and where it had wrecked before being told by Det. Perrett. (RR 41: 17, 19). Applicant told Perrett that he only drove the victim's vehicle out of the road after

watching it wreck and the driver run off. (RR 41: 21). Applicant denied having a girlfriend named Monica, or even knowing a woman by that name. (RR 41: 24). He would later admit that he knew a woman by the name of Monica who lived on Callahan Street. (RR 42: 35). Applicant told the detective that he smoked Newport cigarettes which was the brand of the cigarette found in the victim's car. (RR 41: 28).

After a few days, Det. Perrett spoke to Applicant for another four hours and asked him where the victim's property and the murder weapon had been disposed of in and around a small pound out in the country. (RR 41: 32, 41-45). Applicant led the officers to the pond where they later recovered a knife which Applicant claimed was the murder weapon. (RR 41: 45). Detective Perrett made it clear that despite testimony that Applicant claimed that Jamarist "Monterral" Paxton was presented and forced Applicant to take an active role in the murder, nothing found during his investigation substantiated that claim. (RR 42: 14-16).

Evidence showed that Applicant began to fabricate the Monterral connection only after he was interviewed a second time and was told that the police knew that he had been telling inconsistent accounts of his activities and whereabouts on the night of the murder. (RR 42: 18-20, 37-39, 41, 43-44). Applicant told inconsistent stories regarding his driving the victim's vehicle, first claiming to have seen a drunk white man crash the car before he moved it to the side of the road, then later saying

Monterral forced him to drive the vehicle at gunpoint. (RR 42: 21-26, 43, 45, 48). He initially denied to police that he had told anyone that he had to stab a white man who had put a gun to his head before stealing his vehicle. (RR 42: 26).

In fact, almost everything Applicant told Det. Perrett in his initial video interview was found through further investigation to have been a lie. (RR 42: 28, 30). He lied at least twice regarding how he cut his finger. (RR 42: 29, 39). Applicant further knew details of the offense that were not printed in the paper and were not relayed to him by officers, such as the victim had been stabbed. (RR 42: 46). He lied about knowing where the Mrs. Schneider's purse was, although later he would lead them to the spot where he disposed of her property - including the purse. (RR 42: 49-50). Applicant subsequently confessed that he was present at the victim's house when she was killed, but only because Monterral forced him to go over there at gunpoint. (RR 42: 52). While inside, Applicant claims Monterral tried to break the victim's neck and then told him to get a knife from the kitchen while he pointed a gun at Applicant. (RR 42: 55). He said Monterral ordered him to cut himself with the knife so he would leave DNA evidence at the crime scene. (RR 42: 56-60). Applicant told Detective Perrett he was afraid of Monterral because he had a gun and yet after the murder Applicant said that he went over to Monterral's residence and stayed for at least another day. (RR 42: 60-61, 94-95).

Further inconsistences existed in every phase of Applicant's false account of how Mrs. Schneider was killed; how he wound up being in possession of her car and other property; his whereabouts before and after the killing; and the extent of the alleged participation of Monterral. (RR 42: 63-80, 85-88).

The real truth relayed to the jury through this witness was that Monterral cooperated with law enforcement in their investigation and they found nothing to make him a suspect in the killing. (RR 42: 90-93, 156). Applicant had lied to others as well, telling them on the morning after the offense that he had a fight with white man who had a gun and he stabbed the man and stole his car. (RR 42: 152-55). He had earlier accused his alleged girlfriend, Monica, of setting him up before claiming it was actually Monterral who made him do it and set him up by forcing him to leave DNA evidence in the house. (RR 42: 173-77).

In short, the evidence of Applicant's guilt at trial was in fact as "overwhelming" as the Court later described it. *Williams*, 270 S.W.3d at 115.

## III. ARGUMENT

### 1. The standards for subsequent applications.

A court may not consider the merits of a subsequent state habeas application "except in exceptional circumstances." *Ex parte Kerr*, 64 S.W.3d 414, 418 (Tex. Crim. App. 2002); TEX. CODE CRIM. PROC. art. 11.071 § 5(a) (Vernon 2015). Section

5(a) - the "abuse-of-the-writ" bar - was enacted to hasten postconviction review and discourage piecemeal litigation. *Id.* at 418-19. In other words, "none of this 'every week you file a new petition' which is basically what happens." *Id.* at 419 (citation omitted). Thus, an applicant must file an application which "contains sufficient specific facts establishing" one of these "exceptional circumstances," *Ex parte Kerr*, 64 S.W.3d at 418.

First, an applicant can prove either factual or legal unavailability of the claim. TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(1). This requires proof of unavailability during all prior state habeas applications. *See Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007) ("[T]he factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications."). Legal unavailability occurs when a claim "was not recognized or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state." TEX. CODE CRIM. PROC. art. 11.071 § 5(d).

In addition, an applicant must also make a *prima facie* showing of facts sufficient to invoke the new law. *See Ex parte Brooks*, 219 S.W.3d 396, 400 (5th Cir. 2007). This makes sense because, "[t]o read the statute otherwise would mean that every time a new law is passed or precedent is set, every inmate could file a

subsequent application for writ of habeas corpus, regardless of whether the newly available legal basis applied to his situation, and the court would have to consider the merits. This clearly undermines the purpose of the subsequent-writ provisions." *Id.* at 400.

To prove factual unavailability, an applicant must demonstrate that the factual basis of the claim "was not ascertainable through the exercise of reasonable diligence." TEX. CODE CRIM. PROC. art. 11.071 § 5(e).

Second, an applicant can prove that "but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt." TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(2). This requires an applicant to make a threshold, prima facie showing of innocence by a preponderance of the evidence. Innocence in this context is not a freestanding claim, but a procedural one "that does not provide a basis for relief, but is tied to a showing of constitutional error at trial." *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002). A "claim" of this sort is also known as a "*Schlup*-type claim," id., because Section 5(a)(2) "was enacted in response to" *Schlup v. Delo*, 513 U.S. 298 (1995).

Third, an applicant can prove that, "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the [S]tate's favor one or more of special issues." TEX. CODE CRIM. PROC. art.

11.071 § 5(a)(3). Section 5(a)(3), "more or less, [codifies] the doctrine found in *Sawyer v. Whitley*, 505 U.S. 333 (1992)." *Ex parte Blue*, 230 S.W.3d 151, 151 (Tex. Crim. App. 2007).

## IV. Applicant fails to prove entitlement to merits review of his claims.

Applicant claims that because the Department of Public Safety (DPS) issued a notice on June 30, 2015, asserting that the Federal Bureau of Investigation (FBI) has notified them of "errors in the FBI-developed population database" he would be entitled to file a subsequent Art. 11.071 writ application. (Mot. for Emergency Stay at 2-3). He thus requests from the Court an order staying his execution which is currently scheduled for Thursday, July 16, 2015, to allow time for filing a subsequent writ application.

However, as discussed above, the evidence of guilt in this case has been described by the Court as "overwhelming." *Williams*, 270 S.W.3d at 115. And while DNA evidence was admitted at trial and connected Applicant to the victim's stolen vehicle, Applicant's confession to police that he was present in the victim's house at the time of her murder would likely carry more weight than the DNA testimony.

As would the other evidence that Applicant lied repeatedly regarding his involvement before confessing. And, that he led police to where he disposed of the murder weapon. (RR 41: 45). Applicant further knew details of the offense that were

not printed in the paper, such as the victim had been stabbed. (RR 42: 46). He also lied about knowing where the Mrs. Schneider's purse was, although later he would lead police to the spot where he disposed of her property, including her purse. (RR 42: 49-50).

It should be noted that the DPS letter attached to Applicant's motion explains that, upon reviewing and correcting the errors, "the changes have empirically demonstrated minimal impact on the calculations used to determine the significance of an association." (Mot. for Emergency Stay - Exhibit 1). The letter continues in boldface to state that **"the database corrections have no impact on the inclusion or exclusion of victims or defendants in any result."** *Id.*

Applicant's DNA profile from swabs of interior of the victim's vehicle showed with astronomical odds that Applicant was the contributor of that DNA. (RR 41: 127); *see also* (Attachment I - DPS Lab Supplemental Serology/DNA Report) ("approximately 1 in 2.573 sextillion for Caucasians; 1 in 43.22 sextillion for Blacks; and 1 in 5.531 sextillion for Hispanics."). The testimony at trial is that a "sextillion" is equal to "a trillion times a billion." (RR 41: 129).

1.  **DPS has recalculated the DNA results in this case and the change is, as predicted, minimal.**

Most importantly, DPS has recalculated the probability results on the DNA

profiles previously developed in this case. According to the new calculations, the probability that another random person contributed the DNA found on the items from the victim's vehicle is now "approximately 1 in 2.816 sextillion for Caucasians, 1 in 40.11 sextillion for Blacks, and 1 in 5.453 sextillion for Hispanics. (Attachment II - DPS Amended Statistical DNA Report). While the odds for black persons like Applicant have decreased slightly from the original DPS Lab report, they still remain astronomically high at several *billion* times the total population of the Earth.

Similarly, the probability of another contributor of the DNA found in the blood mixture located on the steering wheel of the victim's car have also been recalculated to reveal the probability of another contributor with the same DNA profile as Applicant to be "approximately 1 in 2.816 sextillion for Caucasians, 1 in 40.11 sextillion for Blacks, and 1 in 5.453 sextillion for Hispanics." (Attachment II - DPS Amended Statistical DNA Report). Both the previous report admitted at trial and the newly calculated report state without any equivocation that "[t]o a reasonable degree of scientific certainty, Clifton Williams is the source of these profiles (excluding identical twins)." *See* (Attachment I - DPS Lab Supplemental Serology/DNA Report); (Attachment II - DPS Amended Statistical DNA Report).

Consequently, regardless of any argument concerning the availability of this evidence, or the amount of time he requests, Applicant simply cannot meet his burden

to make a showing that "but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt." TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(2) (Vernon 2015). The lab results changed only slightly and the new DNA statistical analysis, like the original, remains overwhelmingly against the claim that Applicant is actually innocent.

## 2.     Applicant cannot overcome the subsequent writ bar.

The Court should further dismiss Applicant's freestanding-innocence claim because he makes no argument that it overcomes the abuse-of-the-writ bar. The failure to adequately brief a point of error results in forfeiture of the issue. *See Lucio v. State*, 351 S.W.3d 878, 896-97 (Tex. Crim. App. 2011).

Thus, because Applicant does not even attempt to engage in the required showing for merits consideration of a his new claim in a subsequent application, this Court should summarily dismiss his freestanding-innocence claim as an abuse of the writ process.

## 3.     Applicant fails to prove that he qualifies to proceed under Article 11.073.

Article 11.073 provides an applicant with a potential remedy regarding "certain scientific evidence." TEX. CODE CRIM. PROC. art. 11.073 (Vernon 2015). To take advantage of this statute, an applicant must prove that there is "relevant scientific evidence" that "was not available to be offered" at the applicant's trial or "contradicts

scientific evidence relied on by the [S]tate at trial." TEX. CODE CRIM. PROC. art. 11.073(a)(1)-(2).

This requires an applicant to file a state habeas application "containing specific facts indicating that" the "relevant scientific evidence is currently available and was not available at the time of the [applicant's] trial because the evidence was not ascertainable through the exercise of reasonable diligence" and that the "scientific evidence" would be admissible under the Texas Rules of Evidence. TEX. CODE CRIM. PROC. art. 11.073(b)(1)(A)-(B). If those prerequisites are met, an applicant must then show that, by a preponderance of the evidence, "had the scientific evidence been presented at trial . . . the [applicant] would not have been convicted." TEX. CODE CRIM. PROC. art. 11.073(b)(2). For purposes of the abuse-of-the-writ bar, an applicant can prove unavailability "if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the [applicant] on or before the date on which the original application or a previously considered application, as applicable, was filed." TEX. CODE CRIM. PROC. art. 11.073(c).

In considering whether the "relevant scientific evidence" was not ascertainable, a "court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since . . . the date on which the

original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application." TEX. CODE CRIM. PROC. art. 11.073(d)(1)-(2).

In this case, the DNA profiles themselves have not been challenged, and only the statistical probability of another random contributor has been changed. The change in the probability calculation has been shown to be minimal and remains undeniably well below any showing that the correctness of the jury's verdict should be questioned based upon the change.

**4.    Applicant fails to demonstrate why this Court should reconsider its prior opinions.**

This Court has interpreted Rule 79.2(d) of the Texas Rules of Appellate Procedure as allowing reconsideration of its past habeas dispositions without temporal limit. *See Ex parte Moreno*, 245 S.W.3d 419, 427 (Tex. Crim. App. 2008). Reconsideration is appropriate only "under the most extraordinary," *id.*, or "compelling circumstances," *id.* at 428. The Court has noted its hesitancy to exercise such authority, however:

> We should and will be extremely hesitant ever to exercise our authority to reconsider a decision on an initial post-conviction habeas corpus application, particularly after the passage of a substantial number of years. In almost every instance, the State's legitimate interest in the repose and finality of convictions-even its interest in punishment as weighty and irrevocable as the death penalty-will be substantial indeed and ought not to be disturbed, even in the face of a reasonable and good

faith argument that our disposition on original submission was "incorrect."

*Id.* at 429.

In this case, there is nothing extraordinary or compelling that requires reconsideration. Applicant has not even argued that he is actually innocent based upon the notice from DPS regarding an error in the FBI statistical calculations. His "new" evidence thus solely consists of a letter from DPS explaining that an error has occurred in calculating probability. However, the statistical probabilities in this case have been re-calculated by the DPS Lab and result in an inconsequential change in the probability odds. Applicant is still identified, to a reasonable degree of scientific certainty, as the contributor of the DNA profiles found in the victim's vehicle. (Attachment II - DPS Amended Statistical DNA Report). Thus, the new lab probability calculations, coupled with the trial evidence that remains unchallenged, still overwhelmingly supports the jury's verdict of guilt in this case.

## PRAYER FOR RELIEF

The State respectfully requests that the Court find that Applicant has not met any exception to the abuse-of-the-writ bar or demonstrated that his prior state habeas application warrants reconsideration and, therefore, the State respectfully requests dismissal of Applicant's subsequent state habeas application.

Respectfully submitted,

D. MATT BINGHAM
Criminal District Attorney
Smith County, Texas

Michael J. West
Assistant Criminal District Attorney
SBOT# 21203300
100 N. Broadway, 4th Fl.
Tyler, Texas 75702
(903) 590-1720
(903) 590-1719 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the State's Response to Motion for an Emergency Stay and State's Motion to Dismiss as a Subsequent Writ has been served by electronic filing on the attorney for Applicant, Mr. James Huggler, Attorney at Law, 100 E. Ferguson, Ste. 805, Tyler, Texas 75702.

_____
Michael J. West

**ATTACHMENT I - DPS LAB SUPPLEMENTAL SEROLOGY/DNA REPORT**

# TEXAS DEPARTMENT OF PUBLIC SAFETY

DPS GARLAND CRIME LABORATORY
350 WEST IH 30
GARLAND, TEXAS 75043-5998
Voice 214-861-2190   Fax 214-861-2194



THOMAS A. DAVIS, JR.
DIRECTOR

DAVID McEATHRON
ASST. DIRECTOR

March 24, 2006

**Supplemental Serology\DNA Report**

COMMISSION
ERNEST ANGELO, JR.
CHAIRMAN

CARLOS H. CASCOS
COMMISSIONER

Det. Dennis Mathews
Tyler Police Department
711 W. Ferguson
Tyler, Texas 75702

PROSECUTOR'S COPY

| **Laboratory Case Number** | **Agency Case Number** | **Offense Date** |
|---|---|---|
| L1D-145918 | 0532386 | 07/05/05 |

**Suspect(s)**
Williams, Clifton Lamar

**Victim(s)**
Schneider, Cecelia Kasawski

**Offense:** Homicide
**County of Offense:** Smith (212)

**Requested Analysis**

Perform DNA analysis on the items submitted for comparison to Clifton Williams, Cecelia Schneider, Jamarist Paxton, and Dennis Campbell. Please refer to our report dated December 27, 2005.

**Results of Analysis**

An attempt was made to extract DNA from evidentiary samples relating to this case. The known blood from Cecelia Schneider and Clifton Williams, the buccal swabs from Dennis Campbell and Jamarist Paxton, the cigarette butt (Item 20), and stains from the tissue paper (Item 22, Stain 2 and 71, Stain 2), shorts (Item 103, Stains 1 and 2), driver's floor mat (Item 32) and steering wheel (Item 35) were extracted by a method that yields DNA. DNA typing was performed on selected samples using the polymerase chain reaction (PCR). The following loci were examined: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, Amelogenin, D5S818, and FGA.

The DNA profiles from the cigarette butt (Item 20), stains from the tissue paper (Item 22, Stain 2 and 71, Stain 2), one stain from the shorts (Item 103, Stain 1), and the stain from the driver's floor mat (Item 32) are consistent with the DNA profile of Clifton Williams. Clifton Williams cannot be excluded as the contributor of these stains. The probability of selecting an unrelated person at random who could be the source of these DNA profiles is approximately 1 in 2.573 sextillion for Caucasians, 1 in 43.22 sextillion for Blacks, and 1 in 5.531 sextillion for Hispanics. To a reasonable degree of scientific certainty, Clifton Williams is the source of the cigarette butt (Item 20), stains from the tissue paper (Item 22, Stain 2 and 71, Stain 2), one stain from the shorts (Item 103, Stain 1), and the stain from the driver's floor mat (Item 32) (excluding identical twins).

The DNA profile from the other stain from the shorts (Item 103, Stain 2) is consistent with a mixture from Clifton Williams and an unknown individual. Clifton Williams cannot be excluded as the contributor of the major component in the profile. The probability of selecting an unrelated person at random who could be the source of the major component in this DNA profile is approximately 1 in 2.573 sextillion for Caucasians, 1 in 43.22 sextillion for Blacks, and 1 in 5.531 sextillion for Hispanics. To a reasonable

*ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS – LAB ACCREDITATION BOARD*
COURTESY – SERVICE - PROTECTION

degree of scientific certainty, Clifton Williams is the source of the major component of the stain from the shorts (Item 103, Stain 2) (excluding identical twins). Cecelia Schneider, Dennis Campbell, and Jamarist Paxton are excluded as contributors to this stain.

The DNA profile from the stain from the steering wheel (Item 35) is consistent with a mixture from Clifton Williams and Cecelia Schneider. Clifton Williams cannot be excluded as a contributor to the stain. The probability of selecting an unrelated person at random who could be a contributor to the stain from the steering wheel (Item 35) is approximately 1 in 240.6 million for Caucasians, 1 in 1.353 billion for Blacks, and 1 in 1.143 billion for Hispanics. Cecelia Schneider cannot be excluded as a contributor to the stain at the loci D8S1179, D21S11, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, TPOX, D18S51, Amelogenin, and D5S818. At these loci, the probability of selecting an unrelated person at random who could be a contributor to the stain from the steering wheel (Item 35) is approximately 1 in 772.8 thousand for Caucasians, 1 in 10.62 million for Blacks, and 1 in 3.638 million for Hispanics. The approximate world population is 6.3 billion. Dennis Campbell and Jamarist Paxton are excluded as contributors to this stain.

The DNA profile obtained from the cigarette butt (Item 20) has been entered into the Combined DNA Index System. The entered DNA profile will be periodically searched for matches against the state and national DNA profiles of the Convicted Offender Index and the Casework Index (the evidentiary stains).

Remaining samples of the known blood from Clifton Williams and Cecelia Schneider, buccal swabs from Dennis Campbell and Jamarist Paxton, and the stains tested will continue to be stored frozen to preserve the biological constituents.

We are unable to retain this evidence. Please make arrangements to pick it up at your earliest convenience.

*James Nichols*
James Nichols
Forensic Scientist
Texas DPS Garland Laboratory

# ATTACHMENT II - DPS AMENDED STATISTICAL DNA REPORT



# TEXAS DEPARTMENT OF PUBLIC SAFETY



**CRIME LABORATORY**
402 W IH 30
Garland, TX 75043-5902
Voice 214-861-2190  Fax 214-861-2194
GarlandCrimeLab@dps.texas.gov

STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

## Laboratory Case Number: L1D-145918

### Amended Statistical DNA Report
Issue Date:  July 15, 2015

Dennis Mathews
Tyler Police Department
711 W Ferguson
Tyler, TX 75702

**Agency Case Information:**       **Tyler Police Department - 0532386**

**Offense Information:**      Homicide - 07/09/2005 - Smith County

**Suspect(s):**    WILLIAMS, CLIFTON LAMAR
CAMPBELL, DENNIS
PAXTON, JAMARIST

**Victim(s):**    SCHNEIDER, CECELIA KASAWSKI

**Submission Information:**
  **16** - Paper Sack on July 28, 2005 by Clayton E. Perrett
  **17** - Paper Sack on July 28, 2005 by Clayton E. Perrett

### Requested Analysis:

This report is an addendum and should be attached to the original Supplemental Serology\ DNA Laboratory reports dated March 24, 2006 and September 18, 2006.

### Evidence Description, Results of Analysis and Interpretation:

**16 : Paper Sack**

**17 : Paper Sack**

The previously obtained DNA profiles from the cigarette butt (item 20), stains from the tissue paper (item 22, stain 2 and 71, stain 2), one stain from the shorts (item 103, stain 1), the stain from the driver's floor mat (item 32) and the stain from the door (item 39) are consistent with the DNA profile of Clifton Williams.  Clifton Williams cannot be excluded as the contributor of these profiles.  The probability of selecting an unrelated person at random who could be the source of these DNA profiles is approximately 1 in 2.816 sextillion for Caucasians, 1 in 40.11 sextillion for Blacks, and 1 in 5.453 sextillion for Hispanics.  To a reasonable degree of scientific certainty, Clifton Williams is the source of these profiles (excluding identical twins).

The previously obtained DNA profile from the other stain from the shorts (item 103, stain 2) is consistent with a mixture from Clifton Williams and an unknown individual.  Clifton Williams cannot be excluded as the contributor of the major component in this profile. The probability of selecting an unrelated person at random who could be the source of the major component in this profile is approximately 1 in 2.816 sextillion for Caucasians, 1 in 40.11 sextillion for Blacks, and 1 in 5.453 sextillion for Hispanics.  To a reasonable degree of scientific certainty, Clifton Williams is the source of the major component of this

*ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS - LAB ACCREDITATION BOARD*

profile (excluding identical twins).

The previously obtained DNA profile from the stain from the steering wheel (item 35) is consistent with a mixture from Clifton Williams and Cecelia Schneider. Clifton Williams cannot be excluded as a contributor to this profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 242.4 million for Caucasians, 1 in 1.352 billion for Blacks, and 1 in 1.131 billion for Hispanics. Cecelia Schneider also cannot be excluded as a contributor to the profile at the loci D8S1179, D21S11, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, TPOX, D18S51, Amelogenin, and D5S818. At these loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 778,800 for Caucasians, 1 in 10.62 million for Blacks, and 1 in 3.598 million for Hispanics. The approximate world population is 7.0 billion.

This report has been electronically prepared and approved by:

Trisha Kacer
Forensic Scientist
Texas DPS Garland Crime Laboratory